297 F.3d 995
SUMMUM, a corporate sole and church, and R.L. Zefferer, Plaintiffs-Appellants,v.CITY OF OGDEN, a municipal government entity; Glenn J. Mecham, Mayor; Jesse M. Garcia, Member, City Council; Kenneth J. Alford, Member, City Council; Fasi M. Filiaga, Member, City Council; Rick J. Mayer, Member, City Council; John W. Wolfe, Member, City Council; Ralph W. Mitchell, Member, City Council; and Garth B. Day, Member, City Council, Defendants-Appellees.
No. 01-4022.
United States Court of Appeals, Tenth Circuit.
July 19, 2002.

COPYRIGHT MATERIAL OMITTED Brian M. Barnard (James L. Harris, Jr., with him on the briefs) of the Utah Legal Clinic, Salt Lake City, UT, for Plaintiffs-Appellants.
Richard A. Van Wagoner (Allan L. Larson and Andrew M. Morse with him on the brief) of Snow, Christensen & Martineau, Salt Lake City, UT, for Defendants-Appellees.
Before SEYMOUR and HENRY, Circuit Judges, and OBERDORFER, District Judge.*
HENRY, Circuit Judge.

1
In this 42 U.S.C. § 1983 action, Summum, a church, alleges that the City of Ogden (sometimes, "the City"), and various officials of the City, violated the church's First Amendment rights. Both parties moved for summary judgment; the district court granted summary judgment in favor of the City of Ogden. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

I. BACKGROUND

2
On the lawn outside the City's municipal building (sometimes, the "Municipal Grounds"), the City of Ogden maintains, and has maintained since 1966, a monument inscribed with the Ten Commandments (the "Ten Commandments Monument" or the "Monument"). The Ten Commandments Monument is just under five feet tall and three feet wide. Most prominently, the Monument bears an inscription of a version of the Ten Commandments:

3
I AM the LORD thy God.

4
Thou shalt have no other gods before me.

5
Thou shalt not make to thyself any graven images.

6
Thou shalt not take the name of the Lord thy God in vain.

7
Remember the Sabbath day, to keep it holy.

8
Honor thy father and thy mother, that thy days may be long upon the land which the Lord thy God giveth thee.

9
Thou shalt not kill.

10
Thou shalt not commit adultery.

11
Thou shalt not steal.

12
Thou shalt not bear false witness against thy neighbor.

13
Thou shalt not covet thy neighbor's house.

14
Thou shalt not covet thy neighbor's wife, nor his manservant, nor his maidservant, nor his cattle, nor anything that is thy neighbor's.

15
Aples' App. at 87, 90 (Aff. of Glenn J. Mecham, dated Feb. 22, 1999, Attach. A). Alongside the statements quoted above, the Monument also includes two Stars of David; the Greek letter Chi (χ) and Greek letter Rho (ρ), each superimposed upon the other; an `all-seeing eye'; a pyramid; an eagle; an American flag; some Phoenician letters;1 and a representation of a scroll containing an inscription reading: "Presented to the City of Ogden and Weber County Utah, by Utah State Aerie Fraternal Order of Eagles 1966." Id. Located to the left and to the right of the Monument are, respectively, a police officer memorial and a sister city tree and plaque. Also located on the Municipal Grounds, though somewhat removed from the area containing the above-described monuments, are various historical markers.

16
The City of Ogden originally acquired the Ten Commandments Monument as a gift from a community organization calling itself the Fraternal Order of Eagles (the "Eagles"). During the 1950s and 1960s, the Eagles donated similar monuments to communities across the United States. Through the monument program, the Eagles hoped to provide American youth with "a code of conduct or standards by which [those youth might] govern their actions." Aples' Br. at 7. Perhaps not surprisingly, the Eagles' monuments have generated considerable litigation. See, e.g., Summum v. Callaghan, 130 F.3d 906, 909, 919-20 (10th Cir.1997) ("Callaghan") (concluding that Summum stated a Free Speech Clause claim where a municipality displayed a "Ten Commandments monolith" — created and donated by the Eagles — while simultaneously declining to display "a monolith displaying certain religious tenets of the Summum church"); Books v. City of Elkhart, Ind., 235 F.3d 292, 302-07 (7th Cir.2000) (concluding that an Indiana municipality's display of an identical Ten Commandments Monument violated the Establishment Clause), cert. denied, 532 U.S. 1058, 1058-59, 121 S.Ct. 2209, 149 L.Ed.2d 1036 (2001).

17
Summum is a religion formed, in 1975, and chartered in Utah. Arguing that the City's display of the Ten Commandments Monument violates the church's First Amendment right to be free from an establishment of religion, followers of the Summum religion requested that the City remove the Monument. The City declined to do so. Followers of the Summum religion proposed, instead, then, that the City install an identical monument in approximately the same location as the Ten Commandments Monument, this new monument to be funded entirely by private contributions (like the Ten Commandments Monument) but to bear, instead of the Ten Commandments, the Seven Principles of the Summum religion (the "Seven Principles Monument").2 The City of Ogden likewise rejected this offer.

18
Summum brought this suit, alleging that the City of Ogden violates the church's First Amendment rights by displaying the Ten Commandments Monument (in violation of the First Amendment's Establishment Clause) and again violates those rights by displaying that Monument while refusing to display a Seven Principles Monument (in violation of the First Amendment's Free Speech Clause). The City of Ogden countered that, as to the Establishment Clause claim, since our circuit has held that another municipality did not violate that Clause in displaying an identical Ten Commandments Monument, see Anderson v. Salt Lake City Corp., 475 F.2d 29, 30-34 (10th Cir.1973), circuit precedent forecloses us from identifying such a violation here. As to the Free Speech Clause claim, the City primarily argued that the Ten Commandments Monument represents the City's own speech rather than the private speech of the Eagles and thus that the City is not discriminating between private speakers: according to the City, the relevant forum contains no private speech at all. In the alternative, the City argued that, if the City is discriminating in favor of the Eagles and against Summum, such discrimination is nonetheless reasonable, viewpoint neutral, and, in any case, necessary to avoid an independent violation of the Establishment Clause.

19
The district court agreed with the City and, accordingly, granted summary judgment in favor of the City as to both of Summum's claims. As to the Establishment Clause claim, the district court ruled that the Ten Commandments Monument is primarily secular in nature and thus that the City's display of that monument does not violate the Establishment Clause. As to the Free Speech Clause claim, the district court concluded that the City has adopted, as the City's own, the speech contained on each of the permanent monuments located on the Municipal Grounds. To allow Summum to place the Seven Principles Monument on the Municipal Grounds, the court reasoned, would, then, amount to permitting Summum to dictate the City's own expression. Accordingly, the district court ruled that the City had violated neither the Establishment Clause nor the Free Speech Clause of the First Amendment.

II. DISCUSSION

20
At oral argument, Summum's counsel conceded that, absent en banc reconsideration of Anderson v. Salt Lake City Corp., 475 F.2d 29, 30-34 (10th Cir.1973), this panel could not reverse the district court's grant of summary judgment, in favor of the City of Ogden, on Summum's Establishment Clause claim.3 Given Summum's concession, we decline to further consider this issue and thus affirm that portion of the district court's order pertaining to Summum's Establishment Clause claim.

21
We do address Summum's arguments in regard to the Free Speech Clause; we conclude that Summum has demonstrated the City of Ogden's violation of Summum's rights under this clause of the First Amendment and, hence, we reverse the district court's grant of summary judgment on this issue. Our free-speech inquiry proceeds in three steps. First, we dispose of a number of uncontested matters, including (1) review of the elements of a 42 U.S.C. § 1983 claim; (2) notation of the applicable standard of appellate review (de novo); (3) consideration of whether the speech in question constitutes protected speech (it does); (4) identification of the relevant forum (permanent monuments on the grounds of Ogden City municipal building); (5) classification of the relevant forum for purposes of Free Speech Clause analysis (a nonpublic forum); and (6) notation of the applicable standard of Free Speech Clause review (a reasonableness standard that, for one, bars viewpoint discrimination). Second, we apply the relevant standard to the City's actions in rejecting the Seven Principles Monument. In so doing, we conclude that (1) the City did discriminate against Summum in rejecting the Seven Principles Monument while simultaneously displaying the Ten Commandments Monument and, further, (2) that discrimination was, here, unreasonable. Third, we conclude that the City's alleged concern for the avoidance of a violation of the Establishment Clause does not justify rejection of the Seven Principles Monument.

A. Preliminary Matters
1. Elements of a § 1983 Claim

22
Under 42 U.S.C. § 1983, Summum must establish "(1) a violation of rights protected by the federal Constitution or created by federal statute or regulation, (2) proximately caused (3) by the conduct of a `person' (4) who acted under color of any statute, ordinance, regulation, custom[,] or usage, of any State or Territory or the District of Columbia." 1A MARTIN A. SCHWARTZ, SECTION 1983 LITIGATION: CLAIMS AND DEFENSES § 1.4, at 12 (3d ed.1997) (internal quotation marks and footnotes omitted); see also Gomez v. Toledo, 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980) (providing a two-element formulation that encompasses each of the four elements just described). The City of Ogden contests only Summum's establishment of the first element: here, violation of rights protected under the Free Speech Clause of the First Amendment to the United States Constitution (made applicable to the States and the political subdivisions thereof via the Fourteenth Amendment, see Wallace v. Jaffree, 472 U.S. 38, 49-50, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985)).

2. Standard of Appellate Review

23
We review de novo a district court's grant of summary judgment. See Sigmon v. CommunityCare HMO, Inc., 234 F.3d 1121, 1124 (10th Cir.2000) ("We review the district court's grant of summary judgment de novo."). Given the First Amendment context of this case, our conduct of that de novo review includes a particularly rigorous record inquiry. See Z.J. Gifts D-2, L.L.C. v. City of Aurora, 136 F.3d 683, 685 (10th Cir.1998) ("Where First Amendment interests are implicated, this court is obligated to make an independent examination of the record in [the record's] entirety to ensure the challenged regulation does not improperly limit expressive interests."); Revo v. Disciplinary Bd. of the Supreme Court, 106 F.3d 929, 932 (10th Cir.1997) (same).

3. Protected Speech

24
While limited exceptions exist for such categories of speech as "fighting words" and the "obscene," the protections of the Free Speech Clause extend to most speech. Chaplinsky v. New Hampshire, 315 U.S. 568, 571-72, 62 S.Ct. 766, 86 L.Ed. 1031 (1942) ("There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which has never been thought to raise any Constitutional problem."). The Seven Principles Monument does not fall within these limited exceptions and thus constitutes protected speech. See Capitol Square Review and Advisory Bd. v. Pinette, 515 U.S. 753, 760, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995) ("[P]rivate religious speech, far from being a First Amendment orphan, is as fully protected under the Free Speech Clause as secular private expression."). The City of Ogden does not dispute that the proposed Seven Principles Monument constitutes protected speech. See Aples' Br. at 25 ("Appellees do not dispute that the content of Summum's proposed gift is protected speech under the First Amendment.").

4. Identification of the Relevant Forum

25
Once we have confirmed that the speech in question is "protected speech" for purposes of Free Speech Clause analysis, that analysis proceeds via identification and classification of the relevant forum and then, depending upon the forum's classification, application of the relevant standard of Free Speech Clause review. See, e.g., Good News Club v. Milford Cent. Sch., 533 U.S. 98, 106, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001) ("The standards that we apply to determine whether a State has unconstitutionally excluded a private speaker from use of a public forum depend on the nature of the forum."). Thus we turn next to the identification of the relevant forum.

26
Identification of the relevant forum requires a nuanced approach that considers (1) the government property to which access is sought and (2) the type of access sought. See Cornelius v. NAACP Legal Def. and Educ. Fund, Inc., 473 U.S. 788, 800-02, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985) ("[F]orum analysis is not completed merely by identifying the government property at issue. Rather, in defining the forum[,] we have [also] focused on the access sought by the speaker."); Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 44, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983) (defining the applicable forum as the mailboxes of the school's teachers and the school's "interschool mail system").

27
Here, the government property at issue is the lawn of the Ogden City municipal building. The access sought is not merely to converse or post temporary signs on the lawn, but the right to place permanent monuments on the lawn: hence the relevant forum is `permanent monuments on the lawn of the Ogden City municipal building.' Again, the City of Ogden does not dispute this conclusion. See Aples' Br. at 20, 29-30 (describing the applicable forum as "[t]he gallery of [permanent] monuments" located on the "Municipal Grounds").

5. Classification of the Forum

28
The appropriate standard of Free Speech Clause analysis depends on the classification of the forum. The `permanent monuments on the lawn of the Ogden City municipal building' forum may constitute: (1) a traditional public forum (e.g., parks and streets), (2) a designated public forum (i.e., the government voluntarily transforms a nonpublic forum into a traditional public forum, thereby bestowing all the free speech rights associated with the traditional public forum, albeit on a potentially temporary basis, onto that now `designated public forum'), or (3) a nonpublic forum (i.e., the government retains the right to curtail speech so long as those curtailments are viewpoint neutral and reasonable for the maintenance of the forum's particular official uses).4 See Cornelius v. NAACP Legal Def. and Educ. Fund, Inc., 473 U.S. 788, 800, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985); Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45-46, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). In classifying a particular forum as either a designated public forum or nonpublic forum, we begin with consideration of the intent of the relevant governmental entity. See Cornelius, 473 U.S. at 803, 105 S.Ct. 3439 ("We will not find that a public forum has been created in the face of clear evidence of contrary intent, ... nor will we infer that the government intended to create a public forum when the nature of the property is inconsistent with expressive activity.").

29
Here, the record is clear that the gallery of permanent monuments on the Municipal Grounds constitutes "[p]ublic property which is not by tradition or designation a forum for public communication." Perry, 460 U.S. at 46, 103 S.Ct. 948 (defining a nonpublic forum). We therefore conclude that the permanent monuments on the lawn of the Ogden City municipal building constitute, here, a nonpublic forum. The City of Ogden agrees. See Aples' Br. at 30 ("The gallery of monuments — to which [Summum] seeks access — is non-public.").

30
6. The Applicable Standard of Free Speech Clause Review

31
Municipalities may restrict access to a nonpublic forum "so long as the [restrictions imposed] are reasonable ... and are viewpoint neutral." Cornelius v. NAACP Legal Def. and Educ. Fund, Inc., 473 U.S. 788, 806, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985); see also Good News Club v. Milford Cent. Sch., 533 U.S. 98, 106-07, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001) ("The State's power to restrict speech [within a nonpublic forum] ... is not without limits. The restriction must not discriminate against speech on the basis of viewpoint and the restriction must be reasonable....") (internal quotation marks and citation omitted). The City of Ogden concurs. See Aples' Br. at 32 ("The City's decision to restrict access to a nonpublic forum need only be reasonable.... and ... viewpoint neutral.").

32
Reasonableness is measured against the purposes of the given forum. See Summum v. Callaghan, 130 F.3d 906, 916 (10th Cir.1997) ("The government may limit speech in a nonpublic forum to reserve the forum for the specific official uses to which [that forum] is lawfully dedicated."). While "[c]ontrol over access to a nonpublic forum can be based on subject matter and speaker identity," this is true only "so long as the distinctions drawn are reasonable in light of the purpose served by the forum." Cornelius, 473 U.S. at 806, 105 S.Ct. 3439; accord Good News, 533 U.S. at 106-07, 121 S.Ct. 2093. Reasonableness in light of the forum's purpose depends upon consideration of "all the surrounding circumstances." Cornelius, 473 U.S. at 809, 105 S.Ct. 3439.

33
Speech restrictions in a nonpublic forum must be not only reasonable but also "viewpoint neutral." Id. at 806, 105 S.Ct. 3439; see also Good News,, 533 U.S. at 106-07, 121 S.Ct. 2093 ("The restriction must not discriminate against speech on the basis of viewpoint.").

34
Although a speaker may be excluded from a nonpublic forum if [the speaker] wishes to address a topic not encompassed within the purpose of a forum, or if [the speaker] is not a member of the class of speakers for whose especial benefit the forum was created, the government violates the First Amendment when it denies access [to a nonpublic forum] to a speaker solely to suppress the point of view [that the speaker] espouses on an otherwise includible subject.

35
Cornelius, 473 U.S. at 806, 105 S.Ct. 3439.

36
B. Application of the Nonpublic Forum's `Reasonable and Viewpoint Neutral' Standard of Free Speech Clause Review

37
The City of Ogden advances two arguments by which the City hopes to establish the reasonableness and viewpoint neutrality of the City's simultaneous (1) display of the Ten Commandments Monument and (2) refusal to display the Seven Principles Monument. First, the City of Ogden argues that the City has adopted the speech of the Ten Commandments Monument and has thus eliminated all private speech from the relevant forum. In the absence of any such private speech, the City argues, the City cannot be in any sense discriminating between potential private speakers, much less doing so either unreasonably or on the basis of viewpoint. Second, the City of Ogden argues that, even if the City has discriminated by rejecting the Seven Principles Monument while simultaneously displaying the Ten Commandments Monument, that discrimination is both reasonable and viewpoint neutral because based upon the historical relevance, to the Ogden City community, of the respective texts. We consider the City's contentions in turn.

38
1. The City of Ogden's Claimed Adoption of the Speech of the Ten Commandments Monument

39
The City of Ogden's primary argument in regard to Summum's Free Speech Clause claim is that, because the City has adopted the speech of the Ten Commandments Monument as the City's own, the City cannot be discriminating between speakers in violation of the Free Speech Clause. Instead, (1) the City is the only party speaking and (2) the Free Speech Clause places no relevant limitations on what the City itself chooses to proclaim. Because we reject the first aspect of the City's argument in this regard, we need not address the second.

40
a. Consideration of the Wells Factors

41
In assessing the City's claimed adoption of the speech of the Ten Commandments Monument, we turn first to our own precedent regarding such proposed `adoptions.' In Wells v. City and County of Denver, 257 F.3d 1132, 1140-42 (10th Cir.2001), — a case not available at the time of the district court's decision and, disappointingly, neither cited nor discussed by either party during briefing or oral argument before our court — we considered whether a sign listing the sponsors of a holiday display constituted the speech of the government or of the sponsors themselves. In deciding that the sign constituted government speech, we adopted and considered four factors: (1) whether the central purpose of the sign was to promote the views of the municipality; (2) whether the municipality exercised editorial control over the content of the sign; (3) whether the literal speaker was an employee of the municipality; and (4) whether ultimate responsibility for the content of the sign rested with the municipality. See also Knights of the Ku Klux Klan v. Curators of the Univ. of Mo., 203 F.3d 1085, 1093-94 (8th Cir.2000) (developing the factors we borrowed in Wells).

42
We consider the Wells factors in turn. First, the central purpose of the Ten Commandments Monument is to advance the views of the Eagles rather than those of the City of Ogden. The Eagles designed, produced, and donated the Ten Commandments Monument, all with the avowed purpose of providing a moral code for youth to emulate. Indeed, the Eagles presented similar monuments to municipalities across the country, all toward the same aim. That the Monument's central purpose is to promote the views and agenda of the Eagles rather than the City of Ogden is further evidenced by the City attorney's concession, at oral argument, that the City has no idea as to the meaning of parts of the Monument, particularly the Phoenician letters. Cf. Wells, 257 F.3d at 1141 (noting, in considering the central purpose factor, that the City exercised "complete control" over the "construction, message, and placement" of the disputed sign).

43
Second, certainly the City of Ogden maintained no editorial control over the design and creation of the Monument. Rather, the Eagles exercised complete control over the content of the Monument, turning over to the City of Ogden a completed product. Cf. id. at 1142 (noting, in concluding that the government exercised editorial control over the sign at issue, that "there is no indication that any of the [private speakers] even knew about the [disputed sign], much less exercised any editorial control over its design or content" and further relying on the fact that the municipality "built, paid for, and erected" the sign at issue).

44
The third and fourth factors are, admittedly, somewhat less clear in our context. After the Eagles donated the Monument to the City of Ogden, we might think that the City became the literal speaker, every day proclaiming the contents of the Monument. We conclude, however, that the Eagles are properly considered the "literal speaker" of the speech contained on the Monument. We so conclude based upon recognition of the fact that the Eagles, free from any City control, composed the speech contained on the Monument — a fact underlined by the Monument's explicit acknowledgment of the Eagles as the Monument's creators. Cf. Knights of the Ku Klux Klan, 203 F.3d at 1094 & n. 10 (relying on the degree to which a government employee "substantial[ly] edit[ed]" the speech at issue to conclude that the government became the literal speaker).5

45
Finally, we consider whether the municipality maintained ultimate responsibility for the content of the Monument. Certainly the City did not initially maintain such responsibility since the Eagles independently constructed the Monument. After the City acquired title to the Monument, however, presumably the City could have sold, re-gifted, modified, or even destroyed the Monument at will. Arguably, then, the City may be charged with ultimate responsibility for the content of the Monument. Cf. Wells, 257 F.3d at 1142 (considering, as to the ultimate responsibility factor, which entity provided security for the disputed sign).

46
b. Consideration of the Post Hoc Nature of the City of Ogden's Effort to Claim Adoption of the Speech of the Ten Commandments Monument

47
Three of the four Wells factors thus suggest that the City of Ogden did not effectively adopt the speech of the Ten Commandments Monument. Any doubt regarding this conclusion is removed through consideration of the after-the-fact nature of the City of Ogden's effort to claim adoption of that speech.

48
The Supreme Court has expressed considerable concern that post hoc rationalizations may obscure viewpoint discrimination. In City of Lakewood v. Plain Dealer Publ'g Co., 486 U.S. 750, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988), the Court required municipalities to employ clear and objective standards in licensing particular newspapers to place newsracks on public property. Without the use of such standards, the Court explained, "post hoc rationalizations by the [municipality] and the use of shifting or illegitimate criteria ... [will] mak[e] it difficult for courts to determine in any particular case whether the [municipality] is permitting favorable, and suppressing unfavorable, expression." City of Lakewood, 486 U.S. at 758, 108 S.Ct. 2138. Similarly, in Cornelius v. NAACP Legal Def. and Educ. Fund, Inc., 473 U.S. 788, 811-13, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985), the Court noted: "The existence of reasonable grounds for limiting access to a nonpublic forum ... will not save a regulation that is in reality a facade for viewpoint-based discrimination." The Cornelius Court, despite recognizing "the validity and reasonableness of the justifications [now] offered by [the government]" proceeded to remand for consideration of whether the government's exclusion of a speaker from a nonpublic forum "was impermissibly motivated by a desire to suppress a particular point of view." Cornelius, 473 U.S. at 812-13, 105 S.Ct. 3439; cf. American Jewish Congress v. City of Beverly Hills, 90 F.3d 379, 385-86 (9th Cir. 1996) (en banc) (holding that a municipality's ad hoc, standardless policy for permitting private religious unattended displays in a public park violated the Establishment Clause because of the policy's potential for impermissibly favoring one religion over another).

49
Here, the City of Ogden is unable to point to any pre-litigation evidence of the City's explicit adoption of the speech of the Ten Commandments Monument. Summum filed the Complaint in this case on March 11, 1999. Four months later, the City of Ogden's City Council issued a statement explicitly noting that the City has "adopted the inscriptions [of each Monument on the grounds of the Ogden City municipal building] as expressions of the City." Aples' App. at 80, 84 (Second Aff. of Norman L. Ashton, dated July 28, 1999, incorporating Mr. Ashton's July 26, 1999 letter to Summum, in which Mr. Ashton explains the City Council's rejection of Summum's proposed gift). This statement, drafted by Mr. Ashton in his role as the City's attorney, constitutes the first written expression of the City's alleged adoption of the speech contained on the Ten Commandments Monument.

50
In his deposition for this case, then-Ogden City mayor Glenn J. Mecham does claim a City practice, pre-dating the rejection of the Seven Principles Monument, of only accepting those proposed gifts that constitute a "legitimate public expression of [the City's] official view." Aplts' App. vol. I, at 271 (Dep. of Glenn J. Mecham, dated June 2, 1999, at 10). The City, however, fails to point to any particular pre-litigation occasion on which the City had actually applied this alleged practice. Indeed, in the one circumstance cited by the City, the successful 1985-1991 effort to install a particular historical marker, the City confesses that, in response to the City Council's query as to "whether the [proposed marker] conformed `to the adopted Goals and Policies for the [development of the grounds of the municipal building],'.... [t]he Staff Report of the Planning Commission explained [that] the `[p]olicies are silent on the addition of monuments and the lack of a master site development plan makes decisions on additions, such as this, a best guess on what works....'" Aples' Br. at 10 (quoting Aplts' App. vol. II, at 508, 551, 553-54 (Aff. of Gloria J. Berrett, dated Apr. 9, 1999, incorporating the Ogden City Planning Commission's Report of Action, dated July 25, 1991)) (emphasis added).

51
In light of the Wells factors and the caselaw's particular concern for post hoc rationalizations in the Free Speech Clause context, we must conclude that the speech represented by the Ten Commandments Monument represents the speech of the Eagles rather than that of the City of Ogden.6

2. The Historical Relevance Justification

52
We must also reject the City of Ogden's contention that the City's discrimination, in favor of the Eagles and against Summum, is reasonable based upon the comparative historical relevance, to the Ogden City community, of the Ten Commandments and the Seven Principles. We do not conclude that a municipality may never maintain a nonpublic forum to which access is controlled based upon `historical relevance' to the given community. Rather, we conclude only that, here, the City of Ogden failed to employ adequate safeguards to ensure that the `historical relevance' criterion did not devolve into a mere post hoc facade for viewpoint discrimination.

53
In Summum v. Callaghan, 130 F.3d 906, 920 (10th Cir.1997), we observed: "Allowing government officials to make decisions as to who may speak on [municipal] property, without any criteria or guidelines to circumscribe their power, strongly suggests the potential for unconstitutional conduct, namely favoring one viewpoint over another." Our concern in Callaghan stems from the Supreme Court's same concern, as expressed in cases such as City of Lakewood v. Plain Dealer Publ'g Co., 486 U.S. 750, 758, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988), and Cornelius v. NAACP Legal Def. and Educ. Fund, Inc., 473 U.S. 788, 811-13, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985), as noted immediately above in section II(B)(1)(b). In Callaghan, we quoted City of Lakewood at length:

54
`[A] law or policy permitting communication in a certain manner for some but not for others raises the specter of content and viewpoint censorship. This danger is at its zenith when the determination of who may speak and who may not is left to the unbridled discretion of a government official.... [W]ithout standards governing the exercise of discretion, a government official may decide who may speak and who may not based upon the content of the speech or viewpoint of the speaker.'

55
130 F.3d at 920 (quoting City of Lakewood, 486 U.S. at 763-64, 108 S.Ct. 2138). See also Board of Regents of the Univ. of Wis. Sys. v. Southworth, 529 U.S. 217, 235-36, 120 S.Ct. 1346, 146 L.Ed.2d 193 (2000) (remanding out of concern that the use of student-body elections to disperse money collected via student activity fees would not adequately safeguard against viewpoint discrimination in the disbursement of those funds).

56
In order to prevent viewpoint discrimination, and thereby remain in compliance with the Free Speech Clause, a municipality need not necessarily employ written guidelines. See Wells v. City and County of Denver, 257 F.3d 1132, 1150 (10th Cir.2001) ("[T]he fact that [a municipality's] policy is unwritten is not fatal, but merely a factor to be considered.") (internal quotation marks omitted). In such a case, a municipality might instead rely upon a "well-established practice" as to its selection amongst speakers. City of Lakewood, 486 U.S. at 770, 108 S.Ct. 2138. We consider, then, in turn, whether the City of Ogden can here rely on either (1) a written policy or (2) a well-established practice as a means of adequately safeguarding against viewpoint discrimination in the City's administration of the asserted `historical relevance' criterion.

57
a. Consideration of Whether the City of Ogden can Ground the Asserted `Historical Relevance' Criterion in Any Written Policy

58
Here, the City of Ogden cannot ground the City's `historical relevance' justification in any written policy. As we have noted, Summum filed the Complaint that initiated this lawsuit on March 11, 1999. Only in late July of 1999 did the City of Ogden's City Council, through the City Attorney, issue a statement explaining that the Seven Principles Monument failed to "fall within the purposes for which the City has reserved the forum," those purposes including "memorializ[ing] historical and cultural events and ideas associated with the area, its settlement and development." Aples' App. at 80, 84 (Second Aff. of Norman L. Ashton, dated July 28, 1999, incorporating Mr. Ashton's July 26, 1999 letter to Summum, in which Mr. Ashton explains the City Council's rejection of Summum's proposed gift).

59
While the City also notes a "Municipal Gardens Master Plan," dated February 24, 1984 [and thus pre-dating the City's rejection of the Seven Principles Monument], this plan does not develop the `historical relevance' criterion. Aplts' App. vol. II, at 508, 528-34 (Aff. of Gloria J. Berrett, dated Apr. 9, 1999, incorporating the Municipal Gardens Master Plan). Rather, the Master Plan merely observes, in passing, that the Plan "does not preclude the concept of making history visible by means of [an] information center, statues, etc." Id. at 531 (emphasis added). This is a slender reed, indeed, upon which to find a policy requiring that monuments be selected based upon historical relevance to the Ogden City community. We conclude, particularly in light of the City's subsequent admission that "[the City's p]olicies are silent on the addition of monuments," id. at 508, 551, 553-54 (incorporating the Ogden City Planning Commission's Report of Action, dated July 25, 1991) (emphasis added), that the City of Ogden has failed to establish a written policy of monument selection based upon historical relevance to the Ogden City community.

60
b. Consideration of Whether the City of Ogden can Ground the Asserted `Historical Relevance' Criterion in Any `Well-Established Practice'

61
Absent evidence of written guidelines to safeguard against viewpoint discrimination, we consider whether the City of Ogden has demonstrated the existence of a `well-established practice' of resort to the `historical relevance' criterion. The City claims such a practice; in support of this claim, the City cites the deposition testimony of then-Ogden City mayor Glenn J. Mecham. Mayor Mecham testified that, in deciding whether to accept a proposed monument, one factor that he would consider was whether the monument represents "a statement that is based upon the history and traditions of Ogden City, as has been manifest in various modes and media since Ogden's inception in 1851." Aplts' App. vol. I, at 278 (Dep. of Glenn J. Mecham, dated June 2, 1999, at 26). Other than that statement, however, Mayor Mecham and the City of Ogden provide no further evidence of the existence of such a practice.

62
Other testimony, including that of Mayor Mecham himself, suggests that the historical significance criterion is not well-established. Mayor Mecham carefully testified that while historical relevance to the Ogden City community may represent one factor upon which he would base a decision to accept a proposed monument, individual members of the City Council may not utilize the same standard. See id. at 277-78 (Dep. of Glenn J. Mecham, dated June 2, 1999, at 25-26). The City of Ogden does not provide any evidence suggesting that those council members, prior to the date on which Summum filed the instant action, ever themselves considered the `historical relevance' criterion.

63
Consideration of the monuments adjacent to the Ten Commandments Monument further suggests that the `historical relevance to the Ogden City community' standard is not well-established. The adjacent monuments are (1) a monument commemorating police officers who have given their lives in service to Ogden City and (2) a tree and plaque commemorating Ogden City's sister city. That these monuments suggest a theme of `historical relevance' is not self-evident; the City makes no effort to explain the presence of these monuments in terms of historical relevance to the Ogden City community.

64
Thus, the City of Ogden has provided no evidence of a written policy directing that monuments be accepted for placement on the lawn of the municipal building based upon historical relevance to the Ogden City community. Instead, the City has provided only the relatively scant and conclusory deposition testimony of one individual in order to demonstrate resort to such a criterion. We conclude, based on this evidence, that the City has failed to demonstrate the existence of a well-established practice of accepting monuments based upon the monuments' historical relevance to the Ogden City community. Cf. Wells, 257 F.3d at 1150-51 (finding, in a section of the court's opinion different than that discussed above at Section II(B)(1)(a), the existence of a `well-established practice' governing selection amongst competing speakers where the municipality demonstrated the existence of an absolute ban on speech in the given forum — a ban that left the municipality with "very little," "if any," room for discretion). In the absence, then, of any apparent policy governing the City's simultaneous (1) rejection of the Seven Principles Monument and (2) display of the Ten Commandments Monument, we must conclude that the City of Ogden has unreasonably, and in violation of the Free Speech Clause, risked viewpoint discrimination in the relevant forum.

65
C. The Establishment Clause `Defense'

66
Finally, the City of Ogden endeavors to enlist the Establishment Clause in defense of the City's rejection of the Seven Principles Monument. According to the City, displaying the Seven Principles Monument would place the City in violation of the Establishment Clause; the prospect of such a violation, the City argues, justifies any infringement upon Free Speech Clause rights otherwise attributable to the City's rejection of the Seven Principles Monument.

67
The Supreme Court has yet to resolve whether a municipality's interest in avoiding an Establishment Clause violation justifies viewpoint discrimination. See Good News Club v. Milford Cent. Sch., 533 U.S. 98, 113, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001) ("[I]t is not clear whether a State's interest in avoiding an Establishment Clause violation would justify viewpoint discrimination. We need not, however, confront the issue in this case, because we conclude that the school has no valid Establishment Clause interest.") (internal citation omitted). Like the Supreme Court in Good News (and also in Rosenberger v. Rector and Visitors of the Univ. of Va., 515 U.S. 819, 837-46, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995), Lamb's Chapel v. Center Moriches Union Free Sch. Dist., 508 U.S. 384, 394-96, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993), and Widmar v. Vincent, 454 U.S. 263, 271, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981)), we need not resolve this issue because we conclude that the City of Ogden has not established that the display of the Seven Principles Monument would have constituted an Establishment Clause violation. See Summum v. Callaghan, 130 F.3d 906, 920-21 (10th Cir.1997) (reaching the same conclusion on essentially identical facts).

68
While the health of the standard of Establishment Clause analysis developed in Lemon v. Kurtzman, 403 U.S. 602, 612-13, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), may be the subject of some debate, see, e.g., MICHAEL W. McCONNELL, STUCK WITH A LEMON: A NEW TEST FOR ESTABLISHMENT CLAUSE CASES WOULD HELP EASE CURRENT CONFUSION, 83 A.B.A. J. 46 (Feb. 1997), Lemon "has not been overruled" and thus remains the starting point for our Establishment Clause analysis. Lamb's Chapel, 508 U.S. at 395 n. 7, 113 S.Ct. 2141; see also Santa Fe Indep. Sch. Dist. v. Doe, 530 U.S. 290, 314-17, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000) (applying at least the first prong of the Lemon test, that concerning the governmental purpose animating the challenged policy). Under Lemon, we consider the purposes animating the challenged policy, the likely effects of that policy, and whether the policy fosters an excessive entanglement between government and religion. See Lemon, 403 U.S. at 612-13, 91 S.Ct. 2105 ("First, the [given municipal action] must have a secular legislative purpose; second, [the action's] principal or primary effect must be one that neither advances nor inhibits religion; [and,] finally, the [action] must not foster an excessive government entanglement with religion.") (internal quotation marks and citation omitted).

69
Particularly informing our consideration of the Lemon factors is consideration of whether the challenged policy ensures government "neutrality towards religion." Good News, 533 U.S. at 114, 121 S.Ct. 2093 (internal quotation marks omitted) (emphasis deleted). Our neutrality inquiry must consider not only whether the government is actually acting neutrally but also whether a reasonable observer, reasonably informed as to the relevant circumstances, would perceive the government to be acting neutrally.7 Finally, our consideration of the Lemon factors demands sensitivity to any "coercive pressure" imposed upon the relevant community on account of the challenged policy. Id. at 115, 121 S.Ct. 2093; Santa Fe, 530 U.S. at 310-13, 120 S.Ct. 2266 (relying on the coercive nature of prayer at public high school football games to find such prayer to constitute a violation of the Establishment Clause).

70
Applying these factors to the City of Ogden's hypothetical acceptance of the Seven Principles Monument, we are not persuaded that such acceptance would constitute a violation of the Establishment Clause. The City of Ogden advances arguments as to both the purpose and the effect prongs of Lemon. We consider these arguments in turn.

71
First, as to the purpose of the City's hypothetical display of the Seven Principles Monument, the City points only to Summum's purpose in making the donation, a purpose the City characterizes, with a cite only to a deposition not included in the appellate record, as "to use [the Seven Principles Monument] as a proselyt[iz]ing tool, to get out the word concerning Summum's religious beliefs, to attract greater attention to Summum as a viable and alternative religious organization." Aples' Br. at 38. The purpose inquiry, however, centers not on the purpose animating the speech of a particular private actor (e.g., Summum) but, rather, on the purpose for which the government allows such speech on government property. See, e.g., Santa Fe, 530 U.S. at 314-16, 120 S.Ct. 2266 (examining the intent animating the decision of the government to institute a particular policy regarding speech at public high school football games: "[T]he ... policy fails a facial challenge because the attempt by the District to encourage prayer is also at issue.") (emphasis added).

72
If the City of Ogden's City Council displayed the Seven Principles Monument with the purposes that the City attributes to Summum, our concern regarding the Establishment Clause would be great indeed. Here, however, the City presents no evidence suggesting that the City would have maintained an improper purpose in accepting the proposed monument. Based upon the record before us, we cannot conclude that the City of Ogden's acceptance of the Seven Principles Monument would have been motivated by anything other than a concern for equal access.

73
Second, the City argues that a reasonable observer would perceive the City of Ogden's display of the Seven Principles Monument as an endorsement of the tenets of the Summum religion. The City (somewhat ironically in light of the City's simultaneous insistence that the display of the Ten Commandments Monument alone does not violate the Establishment Clause) notes that the presence of the Seven Principles Monument on the Municipal Grounds, coupled with the fact that Summum would be the only church to have contributed a monument to the relevant forum, would leave an observer to conclude that the City of Ogden endorses Summum.

74
Again, we must disagree; we are persuaded that a reasonable observer would, instead, note the fact that the lawn of the municipal building contains a diverse array of monuments, some from a secular and some from a sectarian perspective. The secular monuments would include the police officer memorial, the sister city tree, and certain historical monuments. The sectarian monuments would include one from a Judeo-Christian perspective (the Ten Commandments Monument), see Stone v. Graham, 449 U.S. 39, 41, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980) ("The Ten Commandments are undeniably a sacred text in the Jewish and Christian faiths, and no legislative recitation of a supposed secular purpose can blind us to that fact.") (footnote omitted), and one from the perspective of Summum. As the City of Ogden itself recognizes: "The trend of the [United States Supreme] Court appears to be that greater and more equal accommodation of all ideas (pluralism and diversity), including religious discourse, in public fora does not threaten the private religious freedom the Establishment Clause was meant to protect." Aples' Br. at 26 n. 14. To the extent to which the City of Ogden remains genuinely concerned regarding the likely misapprehensions of passersby, the City might also post a disclaimer, explaining clearly that private entities are responsible for at least some of the Municipal Grounds' monuments, including the Ten Commandments Monument and the Seven Principles Monument. Cf. Capitol Square Review and Advisory Bd. v. Pinette, 515 U.S. 753, 769, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995) ("If [a particular governmental unit] is concerned about misperceptions, nothing prevents [that governmental unit] from requiring all private displays in the [forum] to be identified as such."). Under these circumstances, we cannot conclude that the City's display of the Seven Principles Monument would have had the effect of conveying, to a reasonable and reasonably well-informed observer, that the City of Ogden was endorsing a particular religion.

III. CONCLUSION

75
The Free Speech Clause of the First Amendment compels the City of Ogden to treat with equal dignity speech from divergent religious perspectives. On these facts, the City cannot display the Ten Commandments Monument while declining to display the Seven Principles Monument.

76
For the foregoing reasons, we (1) AFFIRM the district court ruling in so far as that ruling granted summary judgment in favor of the City of Ogden as to Summum's Establishment Clause claim and (2) REVERSE the district court ruling in so far as that ruling granted summary judgment in favor of the City of Ogden on Summum's Free Speech Clause claim. We REMAND for further proceedings consistent with this opinion.

77
OBERDORFER, District Judge, concurs in the result.

Notes:

*
The Honorable Louis F. Oberdorfer, United States District Judge for the District of the District of Columbia, sitting by designation

1
The meaning of these symbols, some sacred in Judeo Christian traditions and others used in ancient and even New Age religions, is less than clear. Some of the symbols are utilized by fraternal organization like the Masonic Lodges, while others have been used at times on American currency; the Greek letters Chi and Rho have often been used to signify the first two letters of the Greek word "Christos," meaning "Messiah" or "Christ."

2
The Seven Principles Monument would be inscribed:
"Creation manifests when balance is perfected between the opposites. By applying higher Law against lower laws, the Creation becomes divine." — Summum
THE GRAND PRINCIPLE OF CREATION
"NOTHING AND POSSIBILITY come in and out of bond infinite times in a finite moment." — Summum
"The Principles of knowing Creation are Seven; those who know these possess the Magic Key to whose touch all locked doors open to Creation." — Summum
THE PRINCIPLE OF PSYCHOKINESIS
"SUMMUM is MIND, Thought:
The Universe is a Mental Creation." — Summum
THE PRINCIPLE OF CORRESPONDENCE
"As above, so below; as below, so above." — Summum
THE PRINCIPLE OF VIBRATION
"Nothing rests; everything moves; everything vibrates." — Summum
THE PRINCIPLE OF OPPOSITION
"Everything is Dual; everything has an opposing point; everything has its pair of opposites; like and unlike are the same; opposites are identical in nature, but different in degree; extremes bond; all truths are but partial truths; all paradoxes may be reconciled." — Summum
THE PRINCIPLE OF RHYTHM
"Everything flows out and in; everything has its season; all things rise and fall; the pendulum swing manifests in everything; the measure of the swing to the right is the measure of the swing to the left; rhythm compensates." — Summum
THE PRINCIPLE OF CAUSE AND EFFECT
"Every Cause has its Effect; every Effect has its Cause; everything happens according to Law; Chance is just a name for Law not comprehended; there are many fields of causation but nothing escapes The Law." — Summum
THE PRINCIPLE OF GENDER
"Gender is in everything; everything has its Masculine and Feminine Principle; Gender manifests on all levels." — Summum
PRESENTED TO OGDEN CITY & WEBER COUNTY BY SUMMUM 1999
Aplts' App. vol. II, at 407, 428, 431 (Complaint, dated Mar. 11, 1999, Ex. R).

3
Summum's concession may have been unwise; the Establishment Clause issue is certainly not so straightforward as the City would presume. First, in light ofStone v. Graham, 449 U.S. 39, 41-42, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980), and Summum v. Callaghan, 130 F.3d 906, 910 n. 2, 913 n. 8 (10th Cir.1997), the health of our Anderson precedent is subject to question. Second, even to any extent to which Anderson remains good law, the fact that Anderson considered an identical Ten Commandments Monument is not necessarily controlling. Establishment Clause inquiry considers, amongst other factors, the purpose and effect of the religious speech at issue. See Lemon v. Kurtzman, 403 U.S. 602, 612-13, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) (developing a three-pronged Establishment Clause analysis, the first two prongs of which consider, respectively, the purpose and effect of the religious speech at issue); Santa Fe Indep. Sch. Dist. v. Doe, 530 U.S. 290, 314-17, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000) (developing the purpose prong analysis); Stone, 449 U.S. at 41-43, 101 S.Ct. 192 (same); County of Allegheny v. American Civil Liberties Union, 492 U.S. 573, 597-622, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989) (developing the effect prong analysis). The fact that the municipality at issue in Anderson (Salt Lake City) maintained a proper purpose in displaying that municipality's Ten Commandments Monument does not establish that the City of Ogden maintained such a proper purpose. Nor, particularly in light of Allegheny's fact-intensive inquiry, does the fact that Salt Lake City's Ten Commandments Monument did not have an improper effect establish that the City of Ogden's Monument was not likely to have such an improper effect.

4
A `limited public forum' is a subset of the nonpublic forum classificationSee, e.g., Summum v. Callaghan, 130 F.3d 906, 914 (10th Cir.1997) ("In more recent cases, ... the [Supreme] Court has used the term `limited public forum' to describe a type of nonpublic forum...."). A limited public forum arises where "the government allows selective access to some speakers or some types of speech in a nonpublic forum, but does not open the property sufficiently to become a designated public forum." Callaghan, 130 F.3d at 916.

5
Here we look to the Eighth Circuit'sKnights of the Ku Klux Klan rather than to Wells because Wells, while adopting the literal speaker factor, did not explicitly apply that factor. See Wells, 257 F.3d at 1140-42 ("[W]e rely primarily on the four factors articulated in Knights of the [Ku Klux Klan].").

6
Even the City of Ogden, on occasion, refers to the Ten Commandments Monument as the "OFOE Monument," with OFOE standing in for "Ogden Fraternal Order of Eagles." Aples' Br. at 6, 12, 15 n. 10, 18, 20, 23, 41

7
See Santa Fe, 530 U.S. at 308, 317, 120 S.Ct. 2266 (considering a challenged policy from the vantage point of "an objective observer" and in light of "the history and context of the community and forum") (internal quotation marks omitted); County of Allegheny v. American Civil Liberties Union, 492 U.S. 573, 592, 597, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989) (considering "what viewers may... understand to be the purpose of the [challenged policy]" and whether "the challenged governmental action is [likely] to be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents as a disapproval, of their individual religious choices") (internal quotation marks omitted); cf. Good News, 533 U.S. at 117, 118, 121 S.Ct. 2093 (considering the challenged policy from the vantage point of a reasonable, and reasonably well-informed, observer; prefacing this inquiry, however, with the near disclaimers: "even if we were to consider" and "even if we were to inquire").